15-1145 NTCH, Inc. v. Federal Communications Commission Mr. Evans for the Appellant, Ms. Flood for the Accolade, and Ms. Dixon for the Intervenor Good morning, Mr. Evans. Good morning, and may it please the Court, I am Donald Evans on behalf of NTCH, the Appellant here. The case before us today has two very distinct components. One is a fairly conventional administrative law analysis of whether the FCC, when presented with significant and substantial harms that would result from the proposed applications, took the necessary step of finding that those harms were balanced out by some countervailing benefits. Or in the FCC's parlance, using the criteria that it itself applies, did they weigh the evils against verified and substantiated benefits that would countervail those harms. The second component of this is really more intriguing, and it concerns the extraordinary and baffling series of actions by Verizon and the FCC that resulted in Verizon acquiring hundreds and maybe even thousands of common carrier radio licenses in direct and flagrant contravention of the Communications Act's prohibitions on alien ownership. It's possible or conceivable that the grant of these applications is among the single greatest illegal awards of federal assets in the history of the United States. I don't think that's an exaggeration. So this is a serious problem. But instead of the FCC looking into that, investigating it, either offering or demanding some sort of explanation for how this occurred, the FCC before you is just throwing up a barrage of jurisdictional arguments to try at all costs to prevent judicial review of what's happened here. If I may, I'd like to first address the roaming part of the case, because it's really the easiest one and the simplest one to describe. The issues there arise because my clients, a public interest group, a trade association, and others all convinced the FCC that there was a serious problem with the roaming market in the United States. Because of consolidation in the cellular industry, it was no longer possible for smaller carriers to get reasonable roaming rates from particularly the big two, Verizon and AT&T. Because they had gotten so big and their coverage areas were so broad, they really had no need or incentive to enter into reasonable roaming agreements with other carriers. And without those roaming agreements, the other carriers, like my client, could not be competitive. So the FCC recognized that the acquisition by Verizon here of an additional large cache of spectrum would only make a bad situation worse. And in paragraph 84 of what we'll call the spectrum co-order, the order that granted the applications that issue here, the FCC specifically found that there was a significant problem with the availability of both voice and data roaming rates or arrangements with other carriers. That that was a significant issue. The availability of data roaming specifically was a critical problem in the industry. And the transfer of licenses to Verizon would be to an entity that had no incentive whatsoever to enter into reasonable roaming arrangements. That created in the FCC's mind a concrete potential harm to future competition. And in a later paragraph, the FCC said that those harms were substantial and likely. Now, the FCC went on. So we know we've got a real problem here. The FCC went on to describe what its deliberative process is in balancing harms against benefits in paragraph 97 of the spectrum co-order. There they said if you've got an identified harm that's proposed to be counterbalanced by the applicants, the applicants have to provide verifiable, substantiated evidence that the benefits are actually going to occur. And where the harms have been found to be substantial and likely, as they were here, then the benefits have to be commensurately substantial and likely. In other words, there's a higher standard that applies to the benefits if the harms are substantial. Now, we reviewed that under a very differential standard. The FCC made a determination that the conditions that it put on the spectrum co-transfer were adequate to mitigate the anti-competitive effects. And, you know, so what is it that you're asking us to do, and how can you address the commission's argument that that would not redress the harm you've identified? So what specifically are you asking us to order? I'm asking you to order that the commissions, that the benefits that the commission found counterbalanced the harms were not real benefits. I mean, if you look at them carefully, they really were either no benefits whatsoever in the case of the commitment by Verizon to provide commercially reasonable roaming rates, or in the case of perhaps spinning off some spectrum to T-Mobile, there may have been a small benefit, but very slight, and certainly not enough to countervail the significant harm that the commission had found. And that's just a matter of looking at what the proposed benefits were. If you look at the, you know, Verizon came in at the last minute, literally six days before this spectrum co-order was adopted, and they threw on the table a commitment to say, look, what we will do to satisfy the roaming problem is we will commit to agree to abide by the existing data roaming rule that's in effect. Which were then under challenge, even if they prevailed in their challenge. So, I mean, you're asking us to do something that, as you know from reading our cases, we're very hesitant to do, to get in and second guess a balancing determination made by the FCC? I understand that, but this is a pretty clear case. So here's my more precise question. They've raised a challenge that you don't have standing, and part of the analysis there is that we would have to find that whatever it is, the remedy that you are seeking would provide a more than speculative redress for the harm that you've identified. So I'd like you to address at the threshold that question. What exactly are you seeking, and how can you assure us that what you're seeking would in fact redress the anti-competitive effect that you've identified? Okay. Well, remember, the problem that we complained about and which the commission had identified was that we and many others could not get reasonable roaming rates from Verizon. Because now Verizon was going to be an even bigger player in the market and there was going to be less competition in the prices we're going to be, or the terms were going to be less favorable. Right. So we proposed two solutions to that problem. One was to not let Verizon acquire these licenses at all because, as the FCC itself found, that would leave an additional competitive player in the market who would be likely to be an alternative competitive source of roaming for everybody in the market. The other more precise solution that we proposed to the FCC was that they impose express conditions on Verizon that would actually require it to make reasonable roaming rates available, as opposed to just doing what it had been doing, which was nothing. That's not quite right, is it? Because the conditions were relatively new conditions. So when you said they hadn't fixed the problem, these conditions were relatively new conditions. Well, nevertheless. They were under challenge, but they were saying, I mean, the FCC's judgment was, those are the conditions the FCC came up with, saying this is going to guarantee reasonable access. So you want us to— Wait a minute. Those were not FCC. Verizon proposed those conditions. But the FCC adopted them as part of the conditions. And they're on the transaction because FCC has required it. Yes, but they were proposed by Verizon. Well taken. So you say you had proposed two solutions, don't let Verizon acquire or impose these conditions. So you would want us—what I'm asking is, what is it that you would want us to order? You want us to undo the approval. Undo the approval and say this— Isn't enough? Go ahead. These applications cannot be granted because the proponents of the application who have the burden of demonstrating that the benefits outweigh the harms have not met that burden. Therefore, the applications cannot be granted. If the commission wants to revisit that issue on remand, I suppose it could. But what has to happen is the applications have to be—the grant has to be reversed because it was an incorrect grant of the application. Now you say—go ahead. What do you do with your—what are you doing with your procedural argument, that is, if they didn't follow their own procedures on forbearance? You want to go to the alien ownership situation? I want to go on your challenge on the forbearance. That is, you were claiming that, as I understand it, their forbearance with respect to—in the order does not follow their own procedures which require the requesting party to do it in advance and executive agencies to be consulted, et cetera. I mean, what is your argument? Okay. Do you want me to—I should go ahead and just shift then to the alien ownership discussion because that's where it comes in. Judge Pillar, did I answer your questions about what I'm asking for? What I'm asking for is for the FCC to—when this is sent back to them, as I think it has to be because they have not properly showed that the benefits outweigh the harms, I suppose they could look at it again, but they have to do that, and one solution would be to impose conditions that concretely require Verizon to provide reasonable roaming rates to people like us. Well, okay. And that would directly address our problem. You say if we were to invalidate this approval, there would be an additional competitive player in the market, but not so, right? Before the Spectrum was acquired by Verizon, there wasn't an additional competitive player in the market. Spectrum co-held them but hadn't developed the Spectrum, so there wasn't— so I'm just trying to get at the standing issue. I'm looking at what you're asking through that lens in terms of whether what we would do would redress the harm that you've identified, and if it's wholly speculative, some other course of conduct that the FCC takes and some other purchaser, or maybe Verizon under different terms, it's our duty as a federal court to satisfy ourselves that we have jurisdiction, that your client has standing, and I'm just trying to get some kind of clarity on how we can be confident that the remedy that you're seeking wouldn't just be very speculative in terms of remedying the harm that you've identified. Well, I mean, there's two ways to answer that. One is if it went back to the FCC and they simply imposed the conditions, which we've said would be a solution to the problem, clearly we have standing for that because that solution goes directly to the specific problem that we have. The solution of requiring or preventing Verizon from even acquiring the Spectrum co-licenses is a more structural one. The FCC recognizes that competition is furthered if there's a multiplicity of players in the market. It recognized, specifically in the Spectrum co-order, that Spectrum co. is out there as a potential player in the communications marketplace and that that served as some sort of a check on the ability of Verizon to dominate the market the way it actually does. On the foreign licensing, Judge Edward had asked about they didn't even follow their own procedures under the forbearance order, and that is concerning. Yeah. I mean, the whole situation with the alien ownership is problematic, and maybe to get to the answer to your question, Judge Edwards, I have to give you a little bit of the background. And you have to actually start with 1985 because that's when the Commission came out with the declaratory ruling saying, very unmistakably, we consider that minority, indirect minority interests held by a non-controlling partner are counted in determining whether the 20% alien ownership prohibition level is met. That was very clear, unmistakable, as of 1985. The other thing that the Commission said in that 1985 order was, we have an absolute statutory obligation not to grant licenses if there's over 20% minority alien ownership, and we have the obligation to revoke licenses if that happens. The reason I stress that is because Verizon and the FCC are saying that the Commission has complete discretion, you know, prosecutorially to revoke or not to revoke, but at least in 1985 the Commission was saying, we have an obligation to revoke if we find that this situation exists. So the Commission adopts the 1985 order. Fast forward to 2000, Vodafone gets approved by the FCC to take a controlling interest in Verizon, and then shortly after that it changes from a controlling position to a non-controlling position. That theoretically, according to the declaration that the FCC made in 2000, should have triggered a statutory absolute obligation by the FCC to revoke the Verizon licenses. I mean, that should have been the outcome. So forgetting that for a minute, to tie your argument, I want to make sure I understand that on the current forbearance. In other words, your argument is they've given those facts. Go ahead. Okay, well, the reason that's important is because that's dealing with the past licenses that were granted. Yeah, no, I understand. Now we get to 2012, and it seems to dawn on the FCC that it's granted all these licenses without complying with Section 310b3 of the Act. So they hastily conduct a rulemaking proceeding to develop a rationale for forbearing from Section 310b3, and they prescribe like five or six different absolute requirements that have to be met by somebody that's seeking forbearance. Then four days later, before that order is even effective because it hasn't been published in the Federal Register yet, the Commission adopts the Spectrum Quo order in which it grants forbearance but doesn't comply with a single one, not one of the requirements that it said had to be met before forbearance could be granted. So I think that leaves us in a very bizarre situation because you've got the old applications that were granted, clearly unlawfully, but the Commission seemed to be unwilling to acknowledge that explicitly. What's the remedy, in your view, if you're right, that they failed to follow procedures that they prescribed and they clearly are in play here? I mean, I'll ask them, but I see what they say. It's a little perplexing to me, but what is your remedy if you're right? The remedy is the grant of the application has to be reversed because clearly the application was erroneously granted. At the time it was granted, Verizon was not qualified to be a Commission licensee, and the forbearance approach that the Commission took was patently erroneous because it didn't even comply with their own procedures. Although given that that's a rule with prospective focus, I mean, the whole point is we don't want to have major providers with foreign interest unless the Commission has gone through the steps that the forbearance order requires. But that's now no longer the case. There's no foreign interest. The Vodafone is no longer part of Verizon ownership. So isn't that issue moot? No. And, I mean, this is really the key to what we're looking at here because the FCC, you know, the whole course of practice of the FCC over the 10 or 12 years of granting these licenses illegally is something that I think has to be considered in the context of a revocation proceeding. But with respect to the Spectrum Co. applications, it's sort of the same issue that comes up. How did this happen? Why did the FCC grant these applications in the way it did? Even though the foreign ownership was now gone, but the issue that remains is how did this happen? Why did it happen? Why did the FCC sit on our petition for reconsideration, which if they had acted on it within the lawfully prescribed time period, they would have been required to rescind the grant. I hear you on that. The chronology is telling, but telling of what? I mean, it may be that, I mean, it does seem that there were, at least you've identified potential violations, even assuming that there is something that you had that circumstance continued that might warrant a remedy. It's a much harder question what we as a federal court are empowered to do about what we're assuming is a violation of their own forbearance order, just for purposes of this exchange. But even assuming that, if they're no longer in violation, we remand so that the FCC can say, oh, well, there's no foreign ownership here, therefore we don't have to find this to be on balance in the public interest. If that's all there was to it, I would agree with you. But that's not all there is to it. What would have to be looked at, I think, in the same way that you would have to look at it as how did the ten years of licenses get granted, is you'd have to look here and say, how was this granted? Why did the FCC sit on our petition for reconsideration for such a long time? Why did it somehow know that Verizon was getting rid of the foreign ownership that was going to moot the whole problem? Well, let's assume all the answers are of a sort that you would expect. Then what happens? What happens is I think there's a serious, I mean, to me there's a potential for a very, very serious issue here. We don't know. No, no, I have to be a little bit more concrete. I don't know what that means. So do they wring their hands and say, you know, shame on us? I'm talking about in concrete terms. Let's assume that they answer all the questions that you just raised, and I'm not belittling them because I think there are some serious questions here. But let's assume the answers are all what you expect. So what? What happens? Well, let's look at it this way. We gave you some examples of some small guys that falsely represented that they were American citizens when they weren't. In those cases, the FCC doesn't think twice about it. They put the license into revocation proceedings, and they either take the license away or they look into the situation and they find out what the facts are. In this case, Verizon specifically represented in all the past applications and in this particular application that Vodafone's qualifications to be a minority owner in Verizon had been previously approved by the FCC and that there was no need for any further foreign ownership. I'm still trying to be more concrete. So you're saying that the FCC should at least consider, in light of what you're suggesting to be the case, whether they're going to now go and revoke. Because they've got discretion on that. I know you argue otherwise. You think it's mandatory. I think your argument's a little bit difficult. But you're saying the court can certainly say you have to consider it. Yes. And on the discretion aspect, it's very interesting, because the Commission and Verizon rely on Heckler v. Cheney to support a broad prosecutorial discretion to do nothing in these circumstances. But what they seem to have ignored is that there were two exceptions that Cheney identified, one to complete prosecutorial discretion. One is if the substantive statute provides guidelines that guide the enforcement action. And in this case, of course, we have Section 312 of the Act, which lays out seven specific conducts that Congress considered suitable for revocation consideration. And in FCC v. Pottsville, Judge Frankford very eloquently indicated that the public interest standard is a tool that must guide the FCC's determinations not only of granting applications, but revoking applications. And there's one other exception that's in Heckler v. Cheney, which is the other exception in Heckler v. Cheney is an important one under these circumstances, because that exception, it's an unusual one, but it applies very well here. It says if the agency has consciously and deliberately engaged in a policy which effectively abdicates its statutory responsibilities. All right, Mr. Evans, you're well over your time, and so let's hear from Ms. Flood for the commission, and we'll give you a brief rebuttal time. Good morning. May it please the Court, Maureen Flood for the Federal Communications Commission. I'd like to start with the foreign ownership issue. The fact of the matter is this Court lacks jurisdiction to consider every one of NTCH's arguments concerning the foreign ownership status of Verizon Wireless. It's challenged the forbearance grant is moot. It lacks Article III standing to assert that the commission should have initiated a license revocation proceeding, and even if it did have standing, the agency's decision not to do so is unreviewable under the APA. The only live issue is that APA, is that jurisdictional, or is that just the notion that this is committed to the prosecutor? It is jurisdictional. As we point out in our brief, this Court has found that under Fort Sumter Tours, it is, in fact, jurisdictional. And my final point here is that the only live issue Which is jurisdictional? The APA point, the fact that under the APA decisions that are committed to our discretion by law are nonreviewable by the Court. The Court found that in Fort Sumter Tours, and I will point out here that the agency did, in fact, reasonably exercise its discretion in not seeking enforcement action or not initiating that license revocation proceeding. I'll get to that. The only live issue before the Court is the roaming issue, and NTCH's complaints about the roaming conditions are baseless. The commission Wait, I want to go back to the forbearance. You're going through it quickly. I'm not sure I'm following it so quickly. There are procedural notions that the SEC has in mind to follow. They weren't followed here. That's correct, Your Honor, but even if the commission erred in following its own procedures, were this Court to remand, there's nothing to forbear from. Verizon bought out Vodafone's stake in Verizon Wireless, so there's no foreign ownership in Verizon Wireless. The commission couldn't forbear from Section 310b3 on remand because Verizon Wireless is no longer subject to the foreign ownership restrictions in that provision of the statute. Can you give us an explanation? I mean, the chronology does, at least on its face, reek a little of hanky-panky long delay, then they sell the ownership. I mean, there was plenty of time to fulfill the conditions of the forbearance order. There weren't, actually, Your Honor, because Verizon Wireless filed its assignment applications long before the commission adopted the forbearance order. Now, counsel for NTCH is arguing that we did something improper by adopting the forbearance order so close in time to our resolution of the Spectrum Co. leak transactions, but that's not true. If the commission simply wanted to help Verizon Wireless, we could have foreborne from Section 310b3 on our own motion in the order on review, and we decided not to because we had a proceeding underway, already underway, where we proposed to adopt procedures for granting forbearance from Section 310b3 for an entire class of carriers, which included Verizon Wireless. So, yes, the commission, so to speak, put the pedal to the metal to get that order out prior to its decision in the Spectrum Co. order, but it did so so it could apply those procedures to Verizon Wireless, so Verizon Wireless would be treated the same as all carriers in that class, perspectively. But then it wasn't. I'm sorry, I don't understand the question. Then it wasn't. They didn't apply. The commission did not then follow the procedures that it had established. Yes, we did follow the procedures. So under the forbearance order, under the forbearance order, a licensee is required to file a petition for declaratory ruling or some similar filing. Arguably, Verizon Wireless' assignment applications that it filed before the forbearance order satisfied that standard. They disclosed the foreign ownership. That's exactly right. And then they sought to have it declared in the public interest to get the license. That's exactly right. This was in 2012, and so they just said nothing's changed. We're grandfathering it. That's exactly right. And if you look at the orders cited in footnote 25 of the reconsideration order, those were the all-tell and roll cellular transactions. That's exactly what happened. In that case, Verizon Wireless came in and said, Vodafone has a 45 percent stake in me. I think it would be in the public interest if you allowed me to acquire these licenses. And the commission issued a declaratory ruling saying that that would be the case. So for purposes of our procedures, There was no petition for forbearance as your procedures prescribed. You constructed it to paint it that way. And I understand if I'm arguing your case, I would, too. But that's not what happened. You really are sua sponte, now creating this. They weren't coming in, and their references to their ownership, they were almost as an aside, and they certainly wouldn't put anyone on notice that this was to get commission forbearance. Your Honor, I would go back to the forbearance order, where it talks about a petition for declaratory ruling or similar request. And given that the information Petition for forbearance because of the foreign ownership. So you're putting everyone on notice that that's what the issue is. That's correct, Your Honor. It's not the same as taking what they submitted and then saying, well, they also had an appendix that listed all of their parts, and if you looked at them carefully, you could have figured it out. That can't be what the FCC meant. I do think it is, Your Honor, because I think I go back to the fact that it's a petition for declaratory ruling or similar request. Well, let me say this. We did put the applications out, right? We did put the applications out and sought comment on the applications, and the applications clearly describe Vodafone's 45 percent stake in the company. Now, if NTCH believed that Verizon Wireless's acquisition of those licenses were borrowed by Section – Where was there something that said we are petitioning for forbearance because we know that we're otherwise over the line? I missed that. It may be there. I can't find it. It wasn't in there, Your Honor, but we put the applications out. What I'm trying to say to you is, if you take an honest look at the procedures that you now see are in play, that's what it looks like the FCC means to require. You understand where you are. You have to file this notice before the foreign ownership reaches a certain point and see whether or not forbearance will be allowed. That's not – none of that was followed. Okay, Your Honor, we were so close. We adopted the forbearance order, and the commission, in its discretion, decided that rather than going back and requiring Verizon Wireless to jump through, like, specifically the procedural hoops of the forbearance order, that those applications were functionally the same as a petition. But that being said, even – I go back to the point that, even if we didn't follow our forbearance procedures to a T, there's no remedy for petitioners on our NAM because this is no longer a live case of controversy. What would we forbear from? I understand what you mean to argue on the mootness, but I still don't understand on the procedures. You set up a set of procedures which look pretty clear, including looking for advice from other executive agencies. None of this was followed. Your Honor, the reason we did – first of all, we can send applications to executive agencies at our discretion, but putting that aside, there was no need to do so here because Verizon Wireless's foreign ownership status hadn't changed. The commission in prior transactions – and those transactions are cited in footnote 25 of the reconsideration order – the commission in prior decisions had found that Vodafone's 45 percent stake in the company satisfied the 310B4 public interest test. So given that Verizon in this proceeding was representing that Vodafone still owned a 45 percent stake in the company, there was no reason to resend those applications to the executive branch for their review. And I accept that no rules say even if they satisfy for – that doesn't matter on the forbearance question. Your Honor, our rules say that even if they have a prior B4 finding, they still have to go through the Section 310B3 test. Right. But we here reasonably apply the prior Section 310B4 findings. Did the agency spell out this argument? Did the agency give this rationale somewhere? Not in the orders noted below. That's normally the way we do business? It looks like such an obvious point, and normally an agency would say, don't get excited, we understand that you're going to get agitated if we don't give an explanation, here it is. Now you're giving an explanation the agency has never offered. Your Honor, well, I would point out that the agency said in Paragraph 176 of the order that our consent was contingent upon Verizon Wireless's continued compliance with the agreement between Verizon Wireless and Vodafone with the executive branch from 2000. That was the Bell Atlantic Vodafone order. So arguably there was no need to resend this application to the executive branch given that we condition our consent on their continued compliance with that agreement, and that agreement was subsequently amended over time, which we note in Paragraph 176 of the order. The fact of the matter here is the Department of Justice and the FBI don't care whether this is a Section B3 or B4 transaction. What they care about is that Vodafone has a 45% stake in Verizon Wireless, and on repeated occasions they had an opportunity to look at that, and we required Verizon Wireless to continue to comply with that agreement. There was no need to resend it. I'm sorry, but you had mentioned, I thought the touchstone for purposes of the prior examination of foreign ownership was the 2000 approval, or are you talking, then you mentioned several different approvals. Right, so in 2000 we approved the Vodafone Bell Atlantic transaction, which allowed Vodafone to have a stake in the company. Mr. Evans is right. After that transaction, Vodafone's stake dropped to 45%. Now, we on subsequent occasions looked at that 45% stake under Section 310B4, because whereas Mr. Evans' argument is that every license acquired between 2000 and 2012 violated Section 310B3, that's incorrect. And footnote 25 of the reconsideration order, and actually paragraph 11, make that point. Page. That wasn't raised. Page. The question was only raised in the reconsideration petition, wasn't it? That's correct, and argument should One of the arguments that the commission made inside the mootness was that it was procedurally barred because it wasn't raised earlier. That's correct. But you didn't raise that in your plea. Your Honor, we had so many reasons already as to why the We have three different reasons as to why this court shouldn't reach the foreign ownership issue. We decided not to put it in our briefing. The governing statute for the FCC, is it similar to the ones that apply to other that issues not raised, et cetera, et cetera, cannot be considered by those people to review? That's correct. But there's an exception to that? There's an exception where the party could not have known the facts at the time of the underlying proceeding. And that clearly can't be the case here. They knew. They knew. I mean, they absolutely knew. There's a Supreme Court case, even though you haven't raised that, there's a Supreme Court case that says that the court should consider it. It's called EEOC versus FORA. The Supreme Court decision said that that kind of statute, which is common throughout administrative agencies, may not be jurisdictional, but it's sufficiently close to being jurisdictional that the court sui sponte should consider it. And here we have the commission basically relying on that proposition. That's correct. You know, I want to go back for a second to the it's complicated point. Counsel for NTCH seems to be arguing that every license Verizon Wireless acquired between 2000 and 2012 was acquired in violation of Section 310b3, and that's not correct. It depends on how Verizon Wireless acquired the licenses. So in the transaction below, Verizon Wireless was subject to Section 310b3 because Verizon Wireless would be the license holder. And other proceedings, specifically the Alltel proceeding and the Rural Cellular proceeding, which are cited in footnote 25, and we discussed them. That's JA108. It's at the footnote you're talking about Rural Cellular and Atlantis Holdings is what you're referring to as Alltel. Right. And so there Verizon Wireless acquired the licenses pursuant to Section 310b4 because what happened was it acquired another licensee. That licensee became a subsidiary of Verizon Wireless, and the licensee held the licenses. So Vodafone's stake in Verizon Wireless was in a U.S.-organized entity, and that entity controlled the license holder. So it's not accurate to say that the commission turned a blind eye to Verizon Wireless' noncompliance in Section 310b3 for a period of years because it really depends on how it acquired the licenses. But this also goes to the point that the commission previously had evaluated Verizon Wireless' stake and found that it satisfied the Section 310b4 test. That's very, I mean, in this field where what Verizon means to the U.S. market is very different in 2000 and 2008 and 2012. I mean, so an assessment that some ownership stake was in the public interest or not contrary to the public interest in the earlier year, it's a little bit. But it's a different issue, Your Honor. When we look at foreign ownership, and this is borne out in the Bell-Atlantic order, we typically look at competition along foreign routes. We don't look at the size of Verizon Wireless in the domestic telecommunications market. And as we pointed out in the forbearance order, you know, when we granted forbearance, this class of carriers— Explain that a little bit. You look at competition along foreign routes. Could you just elaborate a little bit? When we look at foreign ownership in the company, we look at issues that are related to the foreign ownership. We look at the fact that Vodafone has a 45 percent stake in the company has no bearing whatsoever on Verizon Wireless' spectrum holdings in this company. They're two different issues. And in the forbearance order, and I think this is where you're going about Verizon's spectrum holdings and the fact that today it's a far more dominant provider, right, in domestic telecommunications markets. When we went through our forbearance test in the forbearance order, you know, we explained that Sections 201 and 202 of the Act, which require common carriers like Verizon Wireless to provide services at just and reasonable rates, still applied, notwithstanding foreign ownership of the carrier. I guess I'm just back up. What is the purpose behind the foreign ownership restrictions? The purpose behind the foreign ownership restrictions, it goes back to the 1934 Act. And at the time, Congress didn't want foreign entities to have a significant interest in U.S. entities. And I think it actually goes back to concerns about, well, frankly, concerns about broadcast primarily. Congress didn't want foreign entities to use broadcast stations to broadcast propaganda. And it's changed over time. So why is the inquiry that the FCC uses, you said something about looks at their foreign roots. I thought you said something like that, looks at the Vodafone's. You said they don't look at the domestic market at all. They look at what you said. Well, because the issue is here, whether Vodafone has a 65% interest in Verizon Wireless or a 45% interest or a 30% interest in the domestic telecommunications market, Verizon Wireless is still going to be subject to the provisions of Section 201 and 202 of the Act. And so NTCH's complaint here is that Verizon Wireless is not offering roaming on just and reasonable rates under Section 201 and 202, irrespective of Vodafone's foreign ownership or its stake in Verizon Wireless. Verizon Wireless is still subject to those protections. And insofar as NTCH thinks it's being abused by Verizon Wireless, it can bring a 208 complaint to the commission, which it did. And our Enforcement Bureau found it lacking and denied it. We filed that decision in a July 1st 28-J letter. Can we talk about the roaming conditions? We're way over. We're way over. I'll give you a minute. Okay, with respect to the roaming conditions, the commission reasonably predicted that its newly adopted data roaming rules would protect small wireless carriers like NTCH. Those rules had been in effect for 11 months. The commission had no basis to find that they were ineffective. During that period, not a single carrier filed a roaming complaint with the agency. The data roaming order that adopted those rules provided an avenue for carriers like NTCH to file a roaming complaint. NTCH did. And as I pointed out, our Enforcement Bureau denied that complaint in July of this year. All right, thank you. Is it a settlement in which Verizon promised to obey the law? No, that's part of the approval here. Even if it wasn't. Right. All right, thank you. Thank you. Good morning, Ms. Stetson. Good morning, Your Honors. May it please the Court, Kate Stetson for Verizon. Just a couple quick points. First, Judge Edwards, I think perhaps the conceptual problem we're having with whether and how the FCC applied the forbearance order has to do with what Ms. Flood mentioned was the case even before the forbearance order came to be, which was that back in 2000 the FCC already had approved a foreign ownership, a controlling ownership, in Verizon up to 65.1%. So you have the forbearance order coming out in 2012 saying you have to go through this process for B3 before your percentage exceeds this certain amount. The problem with Verizon was Verizon's percentage at that point had already been exceeded and approved under a separate regime. So if you look at Joint Appendix 83, 84, and 85, what the FCC does with respect to this particular license application is it looks at the previous order under B4. It also mentions importantly, I think to your point, the 2008 commitment made to DOD, DOJ, DHS, FBI, and says we're going to grant this condition. We find it's in the public interest under B3, pursuant to our forbearance authority, on condition that that letter remain in place. That's a standard condition of this approval as well. That is the way that the FCC was able to come to terms with a forbearance situation that already preexisted the forbearance order. I think that's the timing problem the FCC confronted, and I think it solved it. All of this, of course, is assuming that NTCH gets past the mootness issue. And the problem there, I think, is I think Judge Pillard, you asked what is to be done on remand. And what Mr. Evans said was, well, we should ask how did this happen? Why did this happen? There's not really a mechanism for that kind of board of inquiry at the point where the license no longer is held by a foreign owner. This issue is moot, and it was moot a year before the FCC issued its reconsideration order. I wonder if you could, I mean, I didn't want to cut you off if anybody wants to follow up on that, but I wonder if you could also address the standing argument, and in particular, with respect to both the Spectrum Co. order and the order on the prior licenses. Sure. With respect to the order on the prior licenses, let me take that first. Are you referring then to the FCC's statement about clearing up any dispute about ownership of Verizon's licenses generally, not this one? As the FCC, I think, thoroughly explains in its brief, that is a dicta. That is pure dicta. So even before we get to a standing question, I think the fact that we are here talking about not those other licenses awarded in different proceedings that are not before us, that were not involved in the Spectrum Co. application, has nothing to do with the appeal here today. That's the fundamental problem with Mr. Evans's argument. The standing problem is, I think, the second one. It's usually the first here. It's the second. Nothing to do, meaning it's just beyond the scope of the order, so it isn't even a standing question. It's just it's not before us because it's not part of the reconsideration order. The reconsideration order didn't take action with respect to them, and therefore the time for challenging those is long past. Exactly. That's exactly right. Yes, we are here on an appeal from an order pertaining to the Spectrum Co. applications. And then with respect to the Spectrum Co. applications, I think we in our brief, I think at about page 16 or 17, talk about a parade of ifs. Essentially, if Mr. Evans gets his wish, and we can talk about your question, Judge Pillard, what he's asking for. If he gets his wish, this goes back. And apparently, under NTCH's view, there is some kind of a new proceeding, either a revocation or a reexamination, at which point perhaps somebody else gets the licenses, at which point perhaps somebody else charges different roaming rates, at which point perhaps NTCH benefits from that. That is not the stuff of standing. That is a series of speculative transactions, most of which are outside of the FCC's or NTCH's power. Judge Pillard, the last thing I'll say is you asked Mr. Evans what he was asking for here. If you look at page 30 of NTCH's reply brief, you will see the list of wishes. They want a remand with instructions not to act on the applications until the commission has conducted a full hearing. The commission should be directed to impose reasonable roaming rates. The commission should be directed to initiate a show-cause hearing. The problem with the first one is that it's fully within the commission's discretion and moot. The problem with the second one is that the commission, as Judge Pillard pointed out, has vast discretion to impose reasonable conditions. And the problem with the third is that it is fully within the commission's enforcement discretion. If there are no further questions. Thank you, Ms. Sesson. Mr. Evans, you exceeded your time, but we'll give you two minutes. Thank you, Your Honor. I just wanted to finish the point that I was making before I sat down before on the exception in the Hecker-Cheney case, which is a situation where the agency consciously and deliberately adopts a policy that effectively abdicates its statutory responsibilities. I would say that this is that case because the FCC permitted the grant of all these licenses over a course of 12 years unlawfully, and I think that's a conscious and deliberate abdication of its statutory responsibilities that takes this out of the pure discretion situation. To address Judge Randolph's concern about why did we only file this on a petition for reconsideration, there was no way anybody could know that what was at stake here was a forbearance petition. The application itself said there are no new foreign ownership issues raised by this application. When the FCC put it out on public notice, they specifically denominated in the public notice that these are 310D applications, which are the regular standard assignment transfer of control applications. Nothing anywhere indicated that forbearance was anywhere in the works. I had no reason to think that this was in the offing because Verizon hadn't requested it, and at no point did the FCC even hint about it until the August 17th order came out, a few days before the order came out. That's why the FCC didn't even challenge our petition for reconsideration as being untimely or unlawful because they knew that we couldn't have known that this whole thing was happening until the last minute when we couldn't do anything. The FCC refers to the denial of our roaming complaints that we actually did end up filing against Verizon. That denial is now before the court, and the court will see when it takes that up how wrong the FCC was in denying the complaint because the rates are absolutely outrageous, and it shows why we had to come to the FCC in this context seeking some sort of relief. On the dicta point that was discussed with counsel for Verizon, I find that to be a very interesting argument because they're saying that the Spectrum Pro order only dealt with the forbearance with respect to the licenses that were issued there. Ms. Javins, your time has expired. You can finish your sentence. But if that's the case, that means that all the licenses that the commission continued to grant to Verizon after the Spectrum Pro order were also unlawful because according to the dicta argument that means none of those have been foreborn from, and therefore the foreign ownership was still in place, but there was no lawful mechanism for those licenses to be granted. Thank you, Mr. Evans. The case is submitted.
judges: Pillard, Edwards, Randolph